# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| PROTEC GmbH ) | ASBCA No. 61185 |
| ) | |
| Under Contract No. W912CM-14-P-0008 ) | |

APPEARANCES FOR THE APPELLANT:    Paul D. Reinsdorf, Esq.
        Attorney at Law
        Frankfurt/Main, Germany

        Steven J. Kmieciak, Esq.
        Seyfarth Shaw LLP
        Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Raymond M. Saunders, Esq.
        Army Chief Trial Attorney
        Dana J. Chase, Esq.
        Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE SWEET

This appeal involves a contract between the Regional Contracting Office, Wiesbaden (government) and appellant PROTEC GmbH (PROTEC) to maintain and repair equipment at U.S. Army Garrison, Wiesbaden. The government refused to pay some invoices. PROTEC submitted a claim seeking to have the government pay the unpaid invoices. The contracting officer (CO) issued a final decision (COFD) denying that claim, which PROTEC appeals.

The government argues that it properly refused to pay the unpaid invoices because, *inter alia*,[1] PROTEC submitted electronic reports and invoices late, which prevented the government from verifying that PROTEC properly performed the billed-for services. PROTEC responds that the government suffered no prejudice from the late electronic reports and invoices because timely paper reports, the maintenance schedule, and the contracting officer representative's (COR's) role in arranging emergency repairs allowed the government to verify performance. PROTEC also argues that it submitted the invoices late because of delays receiving signed work certificates from the government and invoices from suppliers.

---

[1] Because we find that PROTEC's late submission of reports and invoices justified the government's refusal to pay the unpaid invoices, we do not address the government's other proffered reasons for not paying the unpaid invoices.

· The government properly refused to pay the unpaid invoices because PROTEC failed to submit timely electronic reports and invoices. The lack of timely electronic reports and invoices prevented the government from verifying the work because PROTEC did not submit the paper reports on time, follow the maintenance schedule, or arrange all repairs through the COR or the fire inspector. For repairs in particular, timely reports and invoices were necessary to verify the time and material charges. Nor did government work certificate signature delays or supplier invoice delays cause—let alone justify—the late unpaid invoice submissions. Because the government properly refused to pay the unpaid invoices, the appeal is denied.

## FINDINGS OF FACT

### I. Contract

1. On December 20, 2013, the government awarded Contract No. W912CM-14-D-0008 (0008 Contract) to PROTEC for the maintenance and repair of electronic doors, gates, scanners, sauna compact system and electric/hydraulic barriers, and bollards at U.S. Army Garrison, Wiesbaden (R4, tab 3). The 0008 Contract consisted of two main types of services—preventative maintenance and on-call emergency repairs (*id.* at 51-53).

2. PROTEC had to submit a maintenance schedule within ten days of contract award (R4, tab 3 at 54).

3. Only the COR or the fire inspector could place an emergency repair call, to which PROTEC had to respond within four hours (R4, tab 3 at 53).

4. The 0008 Contract provided that the government would monitor PROTEC's performance in accordance with a Quality Assurance Surveillance Plan (QASP) (R4, tab 3 at 47). The QASP detailed the surveillance and evaluation of PROTEC's performance (supp. R4, tab 204). Under the QASP, the government would document deficient performance in non-conformance reports (NCRs) (*id.* at 4-6).

5. The 0008 Contract required PROTEC to submit an electronic on-call emergency report within two days of performing an emergency repair, and an electronic condition report (collectively, reports) within seven days of performing maintenance (R4, tab 3 at 54-55).

6. The 0008 Contract also required PROTEC to "[s]ubmit invoices for the previous month's contract services in Wide Area Work Flow (WAWF) for approval by the COR No Later Than (NLT) the 10th working [day] of the next month." By stating that invoices had to be for "<u>the</u> previous month's services," the 0008 Contract required

2

that each invoice be for no more than one month's services. (R4, tab 3 at 30 (emphasis added))

7. The government would pay PROTEC for the maintenance on a fixed-price basis, and for the repairs on a time-and-material basis (R4, tab 3 at 3-25, 47).

## II. Contract Administration

### A. Maintenance Schedule and Emergency Calls

8. In accordance with Performance Work Statement § 5.7, PROTEC submitted a proposed maintenance schedule on January 13, 2014, which the government approved (app. supp. R4, tab 11).

9. PROTEC did not follow the maintenance schedule, even before April 2016,[2] as the COR repeatedly informed PROTEC through NCRs (R4, tabs 22-24, 29, 34, 41, 44, 75, 97, 99, 125, 139, 156, 199, 199a; app. supp. R4, tabs 3d, 3s; tr. 1/95, 2/126-28). In particular, at a February 10, 2016 performance meeting, the government faulted PROTEC for not following the maintenance schedule. However, it also noted that the schedule was not logical.[3] Therefore, the parties agreed that PROTEC would submit a revised maintenance schedule (R4, tab 39 at 4; app. supp. R4, tab 343n).

10. Melanie Brill—PROTEC's business manager—testified that PROTEC notified the government weekly what work it would perform. However, she did not testify for how long PROTEC provided those weekly notifications. (Tr. 1/122) As documented in NCR 0016, PROTEC provided weekly schedules for a few weeks, but then stopped (app. supp. R4, tab 3n at 17; tr. 2/206).

11. On April 7, 2016, PROTEC submitted a proposed revised maintenance schedule (R4, tab 55; app. supp. R4, tab 13).

12. On May 2, 2016, the CO informed PROTEC that the proposed revised maintenance schedule was unacceptable. The COR also certified that PROTEC had not performed electrical work on schedule. (R4, tab 73) Indeed, PROTEC never performed the electrical work (tr. 2/111).

---

[2] As discussed below, April 2016 is significant because PROTEC claims that the cause of schedule slippage was the government's delay in responding to an April 7, 2016 proposed revised maintenance schedule.

[3] The schedule was not logical because it called for maintenance of a climbing wall after the climbing season started (tr. 1/113-14).

3

13. On May 7, 2016, PROTEC responded to the CO, explaining that it was unable to perform work according to the schedule due to its employee's injury (app. supp. R4, tab 3n at 11).

14. At a May 11, 2016 performance meeting, the government faulted PROTEC for not following the schedule (R4, tab 76 at 2).

15. On May 17, 2016, PROTEC submitted a second revised proposed maintenance schedule (R4, tab 84 at 1-2). The government did not approve that schedule (tr. 1/131).

16. On June 16, 2016, the CO added a comment to an NCR, indicating that PROTEC still was not adhering to the revised schedule (app. supp. R4, tab 3n at 25).

17. On September 8, 2016, the CO emailed PROTEC to inform it that the COR had observed PROTEC employees performing unscheduled maintenance. PROTEC responded that it had been unable to reach the COR by telephone to schedule the maintenance. The CO responded that PROTEC was not authorized to perform unscheduled maintenance without the COR's prior approval, and an unanswered telephone call did not constitute prior approval. PROTEC agreed not to perform unauthorized maintenance in the future. (R4, tab 155e)

18. The failure to follow the maintenance schedule prevented the government from verifying that PROTEC had performed the maintenance properly (tr. 2/126-28).

19. PROTEC responded to emergency calls from other individuals besides the COR and the fire inspector (R4, tab 193 at 2).

## B. Reports

20. PROTEC did not submit electronic emergency repair reports within two days of emergency services, or electronic condition reports within seven days of maintenance (tr. 1/104-05). Rather, PROTEC documented its work by completing paper work certificates (app. supp. R4, tab 6).

21. However, as both the CO's testimony and the contemporaneous NCRs establish, PROTEC did not submit the work certificates on time (i.e., within two or seven days of the repairs or maintenance respectively) (R4, tabs 32-33, 39, 42, 76, 91, 95-95a, 97, 147a, 151, 190, 199c-d, 199f-h, 199j; app. supp. R4, tabs 3d-e, 3i-3j, 3p, 3r, 3t; tr. 2/126-27, 140-41, 143-44). In response to the NCRs, PROTEC did not dispute that it submitted the reports late (app. supp. R4, tabs 3i-3j, 3p, 3r-3t). Indeed, on September 12, 2016, PROTEC admitted that "most of [the Emergency Reports had] not been sent within the contracted 2-day time frame" (app. supp. R4, tab 3i at 15).

4

22. The testimony of Jurgen Rinner—PROTEC's contract manager—further confirms that PROTEC submitted work certificates for the unpaid work late. Mr. Rinner testified that he would submit the work certificates to the COR, who would sign the certificates within a day or two of performance (tr. 1/74, 92). Therefore, the fact that almost none of the work certificates for the unpaid work contain the COR's signature demonstrates that Mr. Rinner did not obtain the COR's signature on those work certificates by submitting them within a day or two of performance (app. supp. R4, tabs 15-33).

23. The late work certificates prevented the government from verifying that PROTEC had performed the services properly (tr. 2/127-28, 140-41). In December 7, 2015 and September 20, 2016 letters, the CO notified PROTEC that it was not submitting timely reports. The letters also stated that failure to submit timely reports rendered it impossible to verify performance, and would result in non-payment of invoices. (R4, tabs 26, 193)

## C. Invoices

24. Ms. Brill used the work certificates to generate invoices. Each invoice covered multiple work certificates. The invoices included a cover sheet, which indicated the date PROTEC created the invoice (tr. 1/133). The invoices also might include supporting documents, such as work certificates and supplier invoices (tr. 1/40, 116, 129, 133). The government did not pay nineteen of the invoices (unpaid invoices) (app. supp. R4, tabs 15-33).

25. For the unpaid invoices, as Table 1 shows, PROTEC did not submit the invoices for the previous month's contracted services in WAWF within the tenth working day of the next month. Rather, PROTEC was missing the submission deadline by months and years. (App. supp. R4, tabs 15-33)

## TABLE 1: UNPAID INVOICE DELAYS

| Invoice #[4] | Date of Last Supplier Invoice, If Any | Month(s) And Year(s) Of Services[5] | Date Invoice Due[6] | Date Invoice Created | Work Cert. |
|---|---|---|---|---|---|
| 100019/16 | None | 12/15 to 1/16 | 01/14/16 | 07/18/16 | Yes |
| 100020/16 | 12/31/15 | 02/14, 01/15 to 04/15, 06/15 to 12/15[7] | 03/13/14 | 07/18/16 | Yes |
| 100030/16 | 03/28/15 | 01/16 | 02/12/16 | 07/18/16 | Yes |
| 100755/15 | 07/22/15 | 01/15 to 09/15 | 02/13/15 | 07/18/16 | Yes |
| 100806/15 | 08/31/15 | 01/15 to 02/15, 04/15 to 09/15 | 02/13/15 | 07/18/16 | Yes |
| 100809/15 | None | 03/15 | 04/14/15 | 07/18/16 | Yes |
| 100810/15 | None | 03/15 | 04/14/15 | 07/18/16 | Yes |
| 301085/16 | 03/31/16 | 01/16 to 04/16 | 02/12/16 | 07/18/16 | Yes |
| 301223/16 | None | 01/15, 04/15, 06/15, 09/15, 11/15 to 12/15 | 02/13/15 | 07/18/16 | Yes |
| 301283/16 | 9/08/15 | 03/15 to 04/15, 07/15 to 09/15 | 04/14/15 | 07/20/16 | Yes |
| 301317/16 | None | 12/15 | 01/14/16 | 07/28/16 | Yes |
| 301318/16 | None | 03/15 | 04/14/15 | 08/15/16 | No |
| 301369/16 | None | 03/15 | 04/14/15 | 08/15/16 | No |
| 301372/16 | None | 07/15, 09/15 to 11/15 | 08/14/15 | 08/16/16 | No |
| 301376/16 | None | 03/14 to 04/14 | 04/14/14 | 08/17/16 | No |

4  In this opinion, we omit the prefix "10001" from all invoice numbers.

5  Where possible, we derive the "Month(s) And Year(s) of Services" from the work certificates. Where PROTEC did not attach work certificates, we use the dates PROTEC scheduled work, as reported in the worksheets attached to the invoice cover sheet.

6  Because PROTEC was supposed to include only one month's services in an invoice, and the government could not partially pay an invoice, the "Date Invoice Due" column represents the tenth working day of the next month after the first month in which PROTEC provided billed-for services (R4, tab 3 at 30; tr. 2/50, 167).

7  The 100020/16 invoice included a work certificate dated November 27, 2016 (app. supp. R4, tab 25 at 55). That date clearly was a typographical error, as it was after the date PROTEC prepared the invoice on July 18, 2016 (id. at 1). Moreover, the receipt that follows that work certificate—which was dated November 24, 2015—shows that the work certificate date should have been November 27, 2015 (id. at 56).

| 301377/16 | 11/04/15 | 09/15 to 10/15 | 10/14/15 | 08/17/16 | Yes |
| 301384/16 | None | 11/14 to 12/14 | 12/12/14 | 08/23/16 | No |
| 301385/16 | None | 08/14 to 12/14 | 09/12/14 | 08/23/16 | No |
| 301411/16 | 08/11/16 | 06/16 to 08/16 | 07/14/16 | 09/14/16 | Yes |

(App. supp. R4, tabs 15-33)

26. The government repeatedly notified PROTEC that it was submitting invoices late, including in NCR 0012 (app. supp. R4, tab 3j; *see also* R4, tab 39 at 5).

27. The late invoices prevented the government from verifying that PROTEC had performed the services properly (tr. 2/167). Indeed, PROTEC acknowledged that it was crucial for the government to receive a prompt invoice for repairs by conceding that the COR could only verify the time and material charges with a tracked invoice (tr. 1/116, 129).

28. PROTEC does not dispute that it submitted the unpaid invoices late. Rather, Ms. Brill testified that there were two reasons PROTEC submitted the unpaid invoices late. (Tr. 1/119)

29. First, Ms. Brill testified that PROTEC submitted the unpaid invoices late because of delays receiving signed work certificates from the government (tr. 1/119). However, in response to NCR 0012, PROTEC did not assert that it was submitting the unpaid invoices late because of government work certificate signature delays (app. supp. R4, tab 3j at 12). Further, PROTEC has not identified which specific unpaid invoices government work certificate signature delays purportedly delayed. Nor has it quantified how many days of delay the government work certificate signature delays purportedly caused in each instance (*id.*). On the contrary, as Table 1 demonstrates, many unpaid invoices[8] did not even include work certificates, making it impossible for the government to track those invoices to the work (app. supp. R4, tabs 15-17, 21, 24, 28). For the remaining unpaid invoices, many supporting work certificates lacked government signatures. Where there was a signature and a signature date, the signature date was the service date, or shortly thereafter. Therefore, we find that government work certificate signature delays did not cause the late unpaid invoice submissions. (*Id.* tabs 18-20, 22-23, 25-27, 29-33)

30. Second, Ms. Brill testified that PROTEC submitted the unpaid invoices late because of delays receiving supporting supplier invoices (tr. 1/119). However, PROTEC does not explain why the suppliers delayed submitting invoices (*id.*).

---

[8] In particular, Invoice Nos. 301318/16, 301369/16, 301372/16, 301376/16, 301384/16, and 301385/16 did not include work certificates (app. supp. R4, tabs 15-33).

7

Further, in response to NCR 0012, PROTEC did not assert that it was submitting the unpaid invoices late because of supplier invoice delays (app. supp. R4, tab 3j at 13). In any event, PROTEC has not identified which specific unpaid invoices the supplier invoice delays purportedly delayed. Nor has PROTEC quantified how many days of delay the supplier invoice delays purportedly caused in each instance (*id.*). On the contrary, as Table 1 demonstrates, PROTEC did not even submit supplier invoices to support 11 of the 19 unpaid invoices.[9] Moreover, PROTEC received the supplier invoices for the remaining eight unpaid invoices at least a month—and up to a year— before it created its invoice. Therefore, we find that supplier invoice delays did not cause the late unpaid invoice submissions. (App. supp. R4, tabs 15-33)

## III. Procedural History

31. On October 31, 2016, PROTEC submitted a certified claim for the unpaid invoices (R4, tab 198).

32. The CO issued a COFD denying the claim on February 28, 2017 (R4, tab 199 at 7-9).

33. This appeal followed.

## DECISION

## I. The Government Properly Refused to Pay the Unpaid Invoices

The government properly refused to pay the unpaid invoices because PROTEC did not submit timely electronic reports or invoices. The government may refuse to pay an invoice if a contractor does not deliver the services in accordance with the contract requirements, or does not "properly and timely submit[] invoices for those services." It is a contractor's burden to show that the nonpayment was improper. *Ahmed S. Al-Zhickrulla Est.*, ASBCA No. 52137, 03-2 BCA ¶ 32,409 at 160,429-30.

Here, PROTEC submitted electronic reports and invoices late. The 0008 Contract required PROTEC to submit electronic emergency repair reports within two days of emergency repairs, and electronic condition reports within seven days of maintenance (finding 5). It also required PROTEC to "[s]ubmit invoices for the previous month's contract services in Wide Area Work Flow (WAWF) for approval by the COR No Later Than (NLT) the 10th working [day] of the next month" (finding 6). PROTEC did not submit an electronic emergency repair report within two days of

---

[9] In particular, PROTEC only supported Invoice Nos. 100020/16, 100030/16, 100755/15, 100806/15, 301085/16, 301283/16, 301377/16, and 301411/16 with supplier invoices (app. supp. R4, tabs 15-33).

each emergency repair, or an electronic condition report within seven days of each maintenance, as required by the 0008 Contract (finding 20). Moreover, PROTEC did not submit any of the unpaid invoices by the 10th working day of the next month after the month in which PROTEC provided the billed-for services (finding 25). Indeed, PROTEC was not a few days, or even weeks, late in submitting the unpaid invoices. Rather, it was missing the submission deadlines by months and even over a year (*id.*). Because PROTEC submitted electronic reports and invoices late, the government properly refused to pay the unpaid invoices.

## II.    PROTEC's Arguments to the Contrary are Meritless

PROTEC argues that the late submissions of reports and invoices did not prejudice the government. PROTEC also argues that the late submissions of invoices in particular were excused. (App. br. at 47; app. reply br. at 38). As discussed below, PROTEC has not met its burden of showing a lack of prejudice, or an excuse.

### A.    The Late Submissions of Reports and Invoices Prejudiced the Government

PROTEC argues that the government suffered no prejudice from its late submissions of electronic reports and invoices because timely paper work certificates, the COR's awareness of the maintenance schedule, and the role of the COR and the fire inspector in arranging emergency repairs permitted the COR to verify performance (app. br. at 47; app. reply br. at 38). However, PROTEC has not met its burden of showing a lack of prejudice.

First, PROTEC has not shown that the work certificates permitted the COR to verify performance because PROTEC did not submit timely paper work certificates to the COR (finding 21). Indeed, many of the unpaid invoices lacked a work certificate altogether, making it impossible for the government to track the invoice to the work (findings, 25, 29).

Second, PROTEC has not shown that awareness of the maintenance schedule permitted the COR to verify the maintenance work because PROTEC did not follow the schedule (finding 9). Without citing any evidence, PROTEC asserts that three of the 19 unpaid invoices—namely Invoice Nos. 301318/16, 301369/16, and 301376/16— involved electrical work that PROTEC performed on schedule (app. reply br. at 34). However, as PROTEC concedes elsewhere (*id.* at 18), it did not perform the electrical work on schedule (finding 12). Indeed, PROTEC never performed the electrical work (*id.*). PROTEC also argues that it cannot be held responsible for the schedule slippage because that slippage was due to the fact that it took the government approximately three weeks—between April 7, 2016 and May 2, 2016—to reject PROTEC's proposed

9

revised maintenance schedule (app. reply br. at 18, ¶ 92, at 32).[10]  However, PROTEC was not following the schedule even before that period (finding 9).  Indeed, almost none of the billed-for work in the unpaid invoices occurred between April 7, 2016 and May 2, 2016 (finding 25).

Third, PROTEC has not shown that the COR and the fire inspector's role in arranging all emergency repairs permitted the COR to inspect the emergency repairs because the COR and the fire inspector did not make all the emergency repair appointments (finding 19).  Moreover, as PROTEC acknowledges, it was crucial that it submit timely work certificates and invoices for repairs because tracked invoices were the only way the COR could substantiate the time and material charges (app. reply br. at 29-30; app. br. at 42; finding 27).  Therefore, the late reports and invoices prejudiced the government by preventing it from verifying PROTEC's work and bills.

## B.    The Late Unpaid Invoice Submissions are not Excused

PROTEC also argues that government work certificate signature delays and supplier invoice delays justified the late unpaid invoice submissions (app. br. at 47).  However, PROTEC has not met its burden of showing that government work certificate signature delays and supplier invoice delays justified late unpaid invoice submissions.

First, PROTEC has not shown that government work certificate signature delays justified the late unpaid invoice submissions.  PROTEC did not assert in the contemporaneous documents that government work certificate signature delays caused the late unpaid invoice submissions (finding 29).  Moreover, PROTEC has not identified which specific unpaid invoices government work certificate signature delays purportedly delayed (id.).  Nor has it quantified how many days of delay the government work certificate signature delays purportedly caused (id.).  On the contrary, the unpaid invoices show that many unpaid invoices did not even include work certificates (id.).  Moreover, when the unpaid invoices included work certificates, many work certificates lacked government signatures (id.).  Further, when the government signed and dated a work certificate, it did so on the service date, or shortly thereafter (id.).  Such isolated cases of waiting a few days to receive a signed work certificate do not explain—let alone justify—the extensive delays in submitting the unpaid invoices (id.).

_____

[10] PROTEC also complains about the government's failure to turn over an internal memorandum regarding the February 10, 2016 performance meeting. However, PROTEC has not shown that that caused schedule slippage. PROTEC also argues that it provided weekly notices of the maintenance schedule. (App. br. at 45)  However, it only provided those notices for a few weeks (finding 10).

Second, PROTEC has not shown that supplier invoice delays justified the late invoice submissions. Delays by a supplier only excuse a contractor's delay if the supplier's delays themselves are excusable. *E&R Inc.*, ASBCA No. 48056, 95-2 BCA ¶ 27,745 at 138,338; *Maeda Gumi*, ASBCA No. 11122, 67-1 BCA ¶ 6144 at 28,487. Here, PROTEC does not even attempt to show that any supplier invoice delays were excusable (finding 30). Further, PROTEC did not assert in the contemporaneous documents that supplier invoice delays caused the late unpaid invoice submissions (*id.*). Moreover, PROTEC has not identified which specific unpaid invoices the supplier invoice delays purportedly delayed (*id.*). Nor has it quantified how many days of delay the supplier invoice delays purportedly caused (*id.*). On the contrary, the unpaid invoices show that PROTEC did not even support most of the unpaid invoices with supplier invoices (*id.*). For the unpaid invoices PROTEC supported with supplier invoices, it received the supporting supplier invoices at least a month—and up to a year—before it created each unpaid invoice (*id.*). Therefore, any supplier invoice delays did not cause—let alone justify—the late unpaid invoice submissions (*id.*).

In particular, PROTEC argues that one work certificate underlying Invoice No. 100755/15 shows that PROTEC performed repairs on February 5, 2015 and February 6, 2015, but did not receive a supplier invoice until six months later—on July 21, 2015. However, PROTEC offers no explanation for the supplier's six-month delay. (App. reply br. at 37-38) Moreover, instead of submitting its invoice by the tenth business day of the next month after receiving that supplier invoice, PROTEC waited about a year—until July 18, 2016—to submit Invoice No. 100755/15 (finding 25). Therefore, PROTEC's example only serves to highlight why any supplier invoice delays did not cause—much less justify—the late unpaid invoice submission.

CONCLUSION

This appeal is denied.

Dated: May 15, 2019

*James R. Sweet*
_____
JAMES R. SWEET
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

11

I concur                                    I concur

RICHARD SHACKLEFORD                OWEN C. WILSON
Administrative Judge                        Administrative Judge
Acting Chairman                             Vice Chairman
Armed Services Board                        Armed Services Board
of Contract Appeals                         of Contract Appeals


I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61185, Appeal of PROTEC GmbH, rendered in conformance with the Board's Charter.

Dated:


PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals